UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                             )
         Plaintiff,      )
                             )
         vs.             )    Docket No: 05-CR-10220-NMG
                             )
JAMES GOODWYN            )
                             )
         Defendant,      )

### DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURES FROM THE ADVISORY SENTENCING GUIDELINES

    The defendant, James Goodwyn, submits this sentencing memorandum in anticipation of his sentencing scheduled for March 15, 2007. The defendant concedes that the career offender provisions of the advisory Federal Sentencing Guidelines nominally apply[1]. However, pursuant to Title 18 U.S.C. section 3553 (a) the defendant asserts that a sentence of imprisonment substantially lower than that suggested by the career offender range is sufficient, but not greater than necessary, to effectuate the purposes of sentencing.

---

[1] The defendant renews his objection to the application of the career offender provision as previously stated in his objections to the presentence report.

## FEDERAL SENTENCING GUIDELINE CALCULATION

The defendant pled guilty to one count of the distribution of crack cocaine (5 grams or more) in violation of 21 U.S.C. § 841 (a). This offense carries a statutory minimum sentence of five (5) years imprisonment and a statutory maximum sentence of forty (40) years imprisonment.

The Pre-sentence Report (PSR) correctly calculated the base offense level pursuant to the U.S.S.G. §2D1.1(c) at 26.  Pursuant to U.S.S.G. §3E1.1, the defendant is entitled to a three point reduction from the base offense level for his timely acceptance of responsibility.[2] This would adjust the base offense level to a 23.

The pre-sentence report calculated the defendant's criminal history points at 13 which would place him in category VI.  The calculated guideline sentence range would be 92-115 months imprisonment.

The probation department has asserted that the career offender provisions of the U.S.S.G. § 4B1.1 are applicable. Section 4B1.1 directs that the offense level is calculated according to the offense statutory maximum. Pursuant to the enhancement provisions of 21 U.S.C. 841 (b)(1)(b) and 21

---

[2] The defendant fully expects the government to file a motion pursuant to §3E1.1.

U.S.C. 851 the statutory maximum sentence is life

imprisonment[3].  The corresponding base offense level becomes

a 37.  The defendant is still afforded a three (3) point

deduction for acceptance of responsibility which corrects

the offense level to 34.

Under the career offender provision the defendant is

automatically placed into criminal history category VI.

The adjusted guideline sentence is 262-327 months.

## A SENTENCE OF IMPRISONMENT SUBSTANTIALLY LOWER THAN THE GUIDELINE CALCULATION IS WARRANTED

The defendant does not dispute (excepting his

previously noted objections) the guideline calculation as

determined by the probation department.  However, while the

court must calculate and consider the guidelines, they are

advisory and only one of several statutory factors the

court must consider when determining an appropriate

sentence.  United States v. Booker, 543 U.S. 220 (2005).

Although the guideline calculation is one of the relevant

factors and must be calculated, a sentence imposed in

conformity with the guidelines is not presumed reasonable.

United States v. Jimenez-Beltre, 440 F3d. 514 (1st Cir.

2006). Under the factors set forth in 18 U.S.C. §

---

[3] The defendant has objected to the use of prior convictions for the purposes of sentence enhancement and would hereby renew that objection.

3553(a)(2) the defendant submits that a sentence of imprisonment of ten (10) years followed by eight (8) years of supervised release is appropriate and reasonable.

Section 3553(a) directs the court to "impose a sentence sufficient, but not greater than necessary" to comply with certain statutory objectives and relevant factors. United States v. Foreman, 436 F.3d.638 (6th Cir. 2006). Those factors are as follows:

## 1. The nature and circumstances of the offense and the history and characteristics of the defendant.

On November 2, 2006, the defendant pled guilty to one count of Distribution of Cocaine Base, in violation of Title 21, U.S.C. 841(a). He admitted that on December 10, 2004 at approximately 3:30 p.m. in the city of Brockton he sold an amount of crack cocaine over 5 grams to a confidential informant in exchange for five hundred dollars ($500.00).

The circumstances surrounding the offense while serious are consistent with the quintessential small time drug dealer making a small time drug sale. This was not an elaborate conspiracy, nor was it a sophisticated drug operation with a complicated hierarchy, as evidenced by the defendant's personal involvement in the transaction.

Notwithstanding the defendant's acknowledgment of the serious nature of the crime, it should be considered within the context of his entire life and upbringing.

The defendant is a 31 year old African American male. By all accounts, he grew up in a less than ideal environment. His parents, Wallace Goodwyn and Donna Ruffin moved the family to Brockton, Massachusetts when James was a young child. Throughout his entire childhood, James and his siblings suffered from a complete lack of economic, emotional, and institutional support. The family lived in lower class conditions in neighborhoods plagued by drugs and violence.

His father abused alcohol, cocaine, and his mother. At a very tender age, James witnessed the physical violence inflicted upon his mother, but was simply too young too helpless and too scared to intervene. When James was eight years old his father left the family home and never went back. In a poignant moment during the PSI the defendant recalled riding the school bus as a young child and seeing his father wandering the streets presumably high on crack cocaine. This supports the conclusion of the pre-sentence

report, that the defendant had no male role model and very little parental guidance as a youth.[4]

The dysfunction of the family made James angry. He developed problems dealing with his anger, along with other emotional issues. With no person or place to turn to, the problems went untreated. The problems exist to this day and remain untreated.

His mother struggled to provide financially for the family. The demands of being the sole provider left her little time to nurture and support James and his siblings. She married Roy Ruffin when James was twelve. Mr. Ruffin was not abusive to James or his mother, but he never established nor attempted to establish any kind of relationship with the children.

Without any support system and any role models the defendant predictably struggled in school. He was expelled in the tenth grade and essentially turned to the streets. The defendant's educational record defies his actual intelligence and natural abilities. He is articulate, intelligent, and a valuable asset in the preparation of his own defense. He is able to research, comprehend, and discuss the complex legal issues surrounding his case. The

---

[4]  Although once a prohibited factor under U.S.S.G. § 5H1.12 the court must now consider factors such as lack of guidance as a youth when imposing a sentence. 18 U.S.C. § 3661, see also United States v. Jones, 445 F3d. 1 (1st Cir. 2006).

defendant is eager to pursue any and all educational programming available to him while in the custody of the federal bureau of prisons.

Life on the streets had a devastating impact on the defendant during his formative years. They were years plagued by drugs and violence.  As noted in the PSR the defendant was shot twice.  Despite the dangers, the defendant found commonality and comfort with his peers on the streets.  They too were predominately young black men from similar backgrounds with similar problems that he could relate to.  Predictably without any adult supervision he began abusing drugs as a teenager.

His substance abuse began with Marijuana and alcohol. It escalated into the abuse of Ecstasy, Oxycontins, Percosets, and Cocaine. The PSR correctly points out that the defendant has never had any meaningful substance abuse treatment, but believes that he would clearly benefit from such treatment.

The past has been difficult.  The present was predictable, but the future has hope.  His mother has put her life together and is forever committed to helping James.[5]  She bears heavy guilt related to her self perceived

---

[5] The mother has written a letter in support of her son which has been attached to the memorandum.

sense of failure in raising James and his siblings.  James presently enjoys the strong support of a vast extended family.

He is engaged to Karen Cepeda.  They are the proud parents of Jamaira Goodwyn, an adorable one year old baby girl. They desperately want to live together as a family. The PSR reports that Ms. Cepeda is fully committed to staying with the defendant throughout the entire period of his incarceration.  It is a motivating factor and a source of hope and strength for the defendant in his quest to reenter society as a productive law abiding member.

**2.  The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed training or services. 18 U.S.C. § 3553(a)(2)(A-D)**

The offense here is serious and does merit a significant period of incarceration.  Mr. Goodwyn takes the position that a ten (10) period of imprisonment followed by eight (8) years of supervised release, more than adequately reflects the seriousness of the offense.  Ten years imprisonment is a considerable period of incarceration that would satisfy the "needs" of this subsection.  In fact the

court should conclude that such a sentence is more in line with the seriousness of the crime, a single sale of a small amount of Crack, than is the 262 to 327 month sentence suggested by the advisory guidelines.  The number called for in the guidelines is driven more by his career offender and criminal history status than it is by the seriousness of the offense.

   Ten years imprisonment will also act as a significant deterrent to any future criminal conduct.  If the court were to impose the defendant's suggested sentence, the defendant would be forty years old at the time of his release.  It would give him a substantial period of time to think about and take responsibility for his past actions while providing him with the dual incentive of avoiding the same mistakes upon release.  A ten year sentence still gives him the chance to make a life for himself and his family.  In that way, the intermediate sentence proposed by the defendant actually serves more as a deterrent than that recommended by the guidelines.

   James is anxious to pursue all of the counseling, educational, and vocational training available to him during his period of incarceration including the anger management, parenting, and substance abuse classes.  Ten years gives him more than enough time to complete these

programs.  Further incarceration beyond that serves no
recognizable deterrent effect, and does nothing to address
the issues raised in the PSR.  In fact, in its own report
the sentencing commission found that there was no tangible
proof that the 'career offender' provision of the
guidelines protected the public from the future crimes of a
defendant[6].

The defendant's release from custody will be followed by
a mandatory eight (8) years of supervision U.S.S.G. §
5D1.2(b).  He knows that at this point in his life any
future criminal misconduct is not an option.  The message
has been sent and received that these types of crimes are
taken seriously.


3.  **The kinds of sentences available.**

A period of imprisonment of ten years followed by a
period of supervised release of eight (8) years is
authorized by statute.  Title 21, U.S.C. 841(a).  It also
takes into account the mandatory sentence enhancements
mandated under 21 U.S.C. § 841 (b)(1)(B) and 21 U.S.C. §
851.

---

[6] Fifteen Years of Guidelines Sentencing: An Assessment of How Well the
Federal Criminal Justice System is Achieving the Goals of Sentencing
Reform (2004).

**4.  The kinds of sentence and sentencing range established by the Sentencing Guidelines and pertinent policy statements.  18 U.S.C. § 3553(a)(4-5)**

The advisory guideline range has been calculated and addressed *supra*.

**5.  The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty to similar conduct.  18 U.S.C. § 3553 (a)(6)**

A sentence outside of the advisory guidelines will avoid the unwarranted disparity that would otherwise be created in this instance by their rigid application.  The guidelines were originally created to eliminate disparate sentences for similarly situated offenders that committed similar offenses.[7]  However, The United States Sentencing Commission has identified several key areas in which the guidelines have actually created unwarranted disparity in sentencing.

Fifteen Years of Guideline Sentencing, detailed the pattern of disparity when as here the defendant is a black male charged with a drug offense.  Under these circumstances, the commission found that a black defendant charged with a drug offense received a sentence 10% longer than that of his white counterpart. Id. at 123.  Much of this can be attributed to the 100 to 1 Crack to Cocaine

---

[7] The Sentencing Reform Act

Ratio and the Career Offender provision contained within the guidelines.  The defendant is subject to both of these sections of the guidelines.

Black males account for 81% of the offenders sentenced for crack cocaine offenses[8].  Although there is no legitimate distinction between the drugs, the average length of imprisonment for a crack cocaine offense was 119 months compared to 78 months for a powder cocaine offense. Id.  The commission pointed out that most crack offenses are committed by low-level offenders, and that these crimes are more often reported and prosecuted in urban areas made up of mostly minority populations.  They noted that it is the single largest contributor to racial disparity in sentencing. Id.  This disparity is compounded when the "career offender" provision of the guideline is applied.

That provision USSG §4B1.1 places an offender with three prior convictions for offenses involving violence or the distribution of drugs in criminal history VI, and sets the offense level at the guideline range associated with the statutory maximum penalty for the offense.  The defendant by virtue of several minor state court convictions is subject to this provision. The sentencing commission found that in 2000, black males constituted 26%

---

[8] USSC Sourcebook (2002)

of the offenders sentenced under the guidelines, but an overwhelming 58% of the offenders subject to the harsh penalties of the career offender provision. Id. at 133. The commission concluded that the career offender provision has done little to reduce recidivism. Id. What it has done is widen the gap between the white majority and the black minority defendants when it comes to sentencing.

The defendant's requested sentence would mitigate some of the unwarranted disparity created by these provisions. The court should consider that the defendant is still required to serve a ten year minimum mandatory sentence. The minimum mandatory component of his sentence would avoid the unwarranted racial disparity created by the guidelines while simultaneously ensuring society he will serve a sufficient sentence.

The goal of the federal criminal justice system is to be fair, both in perception and in reality. Enforcement of these specific guideline provisions renders it neither. The court post Booker, can and should rectify that racial disparity.

## MOTION FOR A DOWNWARD DEPARTURE

James Goodwyn moves this court pursuant to USSG §4A1.3(b)(1) for a downward departure from the advisory sentencing guidelines because criminal history category VI substantially over-represents the seriousness of his criminal history.  A court may depart from the guidelines when an aggravating or mitigating circumstance, of a kind or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines exists. Koon v. United States, 518 U.S. 81 (1996). However, the court need not find such an aggravating or mitigating factor to justify a departure under §4, because the authority to depart under this section is derived not from 18 U.S.C. § 3553(b), it is derived from the Sentencing Reform Act.  United States v. Shoupe, 988 F.2d 440 (3rd Cir. 1993).

The career offender provision of the guidelines has automatically placed Mr. Goodwyn in category VI.  This designation grossly overstates the seriousness of his past criminal history.  According to the PSR the defendant has three qualifying offenses.

In 1996 at the age of 20 the defendant pled guilty to on count of Possession of Cocaine with Intent to Distribute and received one year of probation.  The facts as alleged

indicated the defendant was caught with four small packets of Crack Cocaine.

In 1997 the defendant pled guilty to one count of Assault and Battery on a Correctional Guard and received a sixty day committed sentence in the house of correction. The facts as alleged indicate the defendant merely resisted a guard's attempt to restrain him

In 2001 at the age of 26 the defendant pled guilty to one count of Resisting Arrest and received a guilty filed disposition.  The facts as alleged indicate that a minor fracas occurred when the defendant was uncooperative and pushed away from officers.

Most of the defendant's record is comprised of misdemeanors.  He has only one scorable prior conviction for drug distribution which occurred nine years prior to the instant offense.  He has never served a state prison sentence, and has no convictions for "serious" crimes of violence.

The resisting arrest charge for which he received the guilty filed disposition should not even be considered as a predicate offense.  This court has on prior occasions ruled against counting such a disposition as a predicate.  United States v. Tavares, 93 F.3d 10 (1997).  The disposition has no finality through appeal or other court proceedings.

Griffiths v. INS, 243 F.3d 45 (1st Cir. 2001).  Therefore, the defendant would object to its application in the case before the court.

It has been noted that Criminal History category VI is the highest category under the guidelines.  It includes individuals with a record for murder, and rape.  It includes individuals that have served major prison sentences.  United States of America v. Jeremy D. Woodley, 344 F. Supp. 2d 274 (2004).  It should not include the defendant.  His inclusion in that category does not further any purpose of the guidelines, which is to treat similar offenders with similar offender characteristics the same. A departure from the guidelines or adoption of the defendant's recommended sentence would better further that objective.

## MOTION FOR A DOWNWARD DEPARTURE DUE TO AN EXRAORDINARY PHYSICAL IMPAIRMENT

James Goodwyn has Keratoconus, an extraordinary physical impairment which will ultimately continue to diminish his vision, and jeopardize his safety during any period of incarceration.  The guidelines suggest that while the physical condition of the defendant is not ordinarily relevant, an extraordinary physical impairment warrants

consideration. U.S.S.G. §5H1.4.  It may in certain
circumstances be reason for the court to depart below the
applicable guideline range.  United States v. Lacy, 99 F.
Supp. 2d 108 (D. Mass. 2000).  Additionally, this circuit
considers whether or not prison facilities can adequately
care for a defendant's particular physical condition as a
relevant factor.  United States v. Martin 363 F.3d 25 (1st
Cir. 2004).

The PSR correctly labels keratoconus as a serious
condition.  Keratoconus is a disease that causes thinning
and deformity to the cornea.  Dr. Reza Dana, his treating
M.D., states that by its very nature the disease "tends to
be progressive and worsens with time."[9]

It has in fact diminished the defendant's vision.  The
defendant has now had two corneal transplants.  The second
coming as a result from trauma received during an
altercation.  Dr. Dana notes that patients who undergo a
second transplant are more susceptible to rejection due to
immune attack or other related complications.  In response,
Dr. Dana has proscribed a very detailed protocol of
monitoring and treatment.

---

[9] Counsel has attached the expert letter of Dr. Reza Dana to the
memorandum.

17

It is doubtful that the Burea of Prisons could adequately and as carefully provide such specialized treatment.  The defendant has already encountered difficulty in receiving even the most basic care while incarcerated on this charge.  Dr. Dana states that the defendant is kept on steroid drops to help mitigate the risk of the corneal transplant rejection.  Even this basic part of the defendant's care has been at times ignored. There is no support to the notion that Mr. Goodwyn will receive better care as an inmate of the Burea of Prisons than he did as a pretrial detainee.  A pretrial detainee has an Eighth Amendment right to adequate medical care that is at least as great as that of a corresponding inmate. Gerakaris v. Champagne, 913 F. Supp. 646 (D. Mass. 1996).

Dr. Dana is rightfully concerned of the effect that a lengthy incarceration of the defendant would have on his treatment.  He explains that even in the absence of any complications, the defendant needs follow up examinations. In the event of complications, a more likely scenario, the defendant would need to be examined several times a month. Further, any additional trauma could lead to loss of the corneal transplant and potential blindness.  The defendant's presently diminished vision already makes him more vulnerable to assault and trauma while in a

correctional facility.  It is not necessary to show that the defendant has been victimized, indeed a judge should act to prevent the violence before it occurs.  <u>United States v. Gonzales</u>, 945 F.2d 525 (2nd Cir. 1991).

The physical condition of the defendant merits special consideration.  Independent or combined with other factors, it should be considered as grounds for a traditional departure or as relevant to his request for a variance from the applicable guideline range.

### <u>Conclusion</u>

For all of the forgoing reasons, the defendant moves this court to impose a sentence of ten years incarceration followed by eight years of supervised release.

By his attorney,

<u>/s/ Joseph F. Krowski Jr.</u>
JOSEPH F. KROWSKI JR.
30 Cottage Street
Brockton, MA. 02301
508-584-2555

Dated:  March 13, 2007

## CERTIFICATE OF SERVICE

I, Joseph F. Krowski Jr., do hereby certify that on this 13th day of March, 2007, I served a copy of the Defendant's Sentencing Memorandum and Motion for Downward Departures (By electronic filing and mail) upon: The Office of the United States Attorney, and The Office of the Board of Probation Department.


/s/ Joseph F. Krowski Jr.
Joseph F. Krowski Jr.

To The Honorable Judge Nathaniel Groton:

My name is Donna Ruffin I'm James Goodwyn mother. I just wanted to write you this letter to give you some back ground on my family and James's life. Up until James was 5 years old we had a great family he had a mother and father in the home and we were happy when James was around 5 years old his father became very abusive toward the family he started taking drugs and doing a lot of terrible things to the family James witness a lot of fighting and abuse many a day we had no food  no heat  we had nothing. James witness a very bad fight in my home my father came to get me because at the time I was just unable to take care of the children or myself Jame's father starting fighting with my father and me he tried to hurt me really bad his father was arrested and at that time Mr. Goodwyn left the home. James was my child that I got my strength from many a day and night I just sat and cried not knowing how I would feed my children or even keep a roof over their head. Things were happening that I was not aware of with the children at school and with there father he was not in the home and they would see him bring his girlfriend's children to school and he would act as if they were not even their. He never called them on birthdays, Christmas or for any reason. It was very hard on the children and he never paid a dime in child support.

I remarried thinking that I was doing the right thing for my children only to realize that it was the worst thing that I could have done for them especially James he felt that someone had come into to my life and taken his place and at that point he turned to the streets of Brockton and he was getting into all kinds of trouble, when he really need rehabilitation and therapy he never got it. If I had things to do over I would have put all of us into therapy. My family has been suffering losses for many years now and I wonder if it will ever end.

 September 20, 2006 my 4 year old grandson died from cancer and on October 20, 2006 my mother died.

 I just have been praying that you will not take James from me for all of the years the

District Attorney is asking for and that you will help him get the rehabilitation that he needs. Thank you for taking the time to read my letter.

Sincerely:

Donna Ruffin

March 13, 2007

Honorable Judge Nathaniel Gorton
c/o Attorney Joseph F. Krowski Jr.
30 Cottage Street
Brockton MA  02301

RE:  James Goodwyn
DOB: 8/15/1975

Dear Judge Gorton,

I am preparing this letter on behalf of my patient, Mr. James Goodwyn, at the request of
his attorney, Mr. Joseph F. Krowski of Brockton, Massachusetts.

Mr. Goodwyn has been a longstanding patient of mine who has a condition called
keratoconus.  This condition has affected both eyes which has led to significant
diminishment of his vision due to thinning and deformity of the cornea which leads to
significant scarring and astigmatism.  By definition keratoconus tends to be progressive
and worsens with time

In the year 2000 Mr. Goodwyn underwent a corneal transplant to remove the diseased
cornea in his left eye and did well after his surgery on various drops to suppress an
immune rejection of his transplant.  Unfortunately, he sustained a severe trauma to his
operated eye which led to a rupture of his eye and loss of his lens inside of his eye.
Although he underwent emergent surgery and the eye was closed, this transplant was
eventually lost due to this trauma and he underwent a second corneal transplant in
December of 2004 in the same (left) eye.

Since that time we have followed Mr. Goodwyn very closely to prevent the loss of this
transplant since patients who undergo a second transplant are by definition more prone to
losing the transplant to an immune attack or other complication than a first transplant.
Because of this propensity for graft loss Mr. Goodwyn has been followed closely by us to
monitor his immunological status, eye pressures, vision, and various parameters related to
his wound healing.

At the moment Mr. Goodwyn is kept on steroid drops to his left eye long term to prevent
the rejection of his transplant.  For his right eye we have opted to fit him with a contact
lens and to defer surgery at this time.

At his last visit with us on December 12, 2006, Mr. Goodwyn's vision with a contact lens in the right eye was 20/40 and 20/400 without a contact lens.  He was fitted with a hard contact lens requiring daily care which provided him with a vision of 20/40.  Overall we are satisfied with the level of his visual rehabilitation but note that he will require close follow up to prevent development of complications.  My estimation is that Mr. Goodwyn will require follow up monitoring several times a year for his eyes even should he not develop a complication, and of course if he develops a complication, he may be required to be seen very closely up to several times per month.

I would recommend that his eye condition be considered when his overall status is accessed in such a manner that would minimize the chances of him receiving late subspecialty care should the need arise.  My second concern is that given the conditions in various correctional facilities, that his eyes be protected from physical trauma since an injury to one or both eyes could significantly complicate his status and potentially lead to subsequent loss of his transplant, which could lead to blindness.

If I can be of any further assistance, please let me know.

Sincerely yours,


Reza Dana M.D. M.P.H M.Sc.
Director of Cornea Service
Massachusetts Eye & Ear Infirmary
Harvard Medical School



RD/jmf